UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                                  Case No. 8:23-cr-158-KKM-CPT

ENOCK EDOUARD
_____/

**REPORT AND RECOMMENDATION**

Before me on referral is Defendant Enock Edouard's *Motion to Suppress and Unseal Applications and Orders Authorizing Interception of Wire and Electronic Communications* (Doc. 104) and the government's response to same (Doc. 151). For the reasons discussed below, I respectfully recommend that Edouard's motion be denied in its entirety.

I.

This case stems from an investigation conducted by several law enforcement agencies, including the Federal Bureau of Investigation (FBI), that targeted a drug trafficking organization centered around Edouard and various other individuals. (Doc. 149-2 at ¶ 4). As part of this investigation, the government submitted three applications to United States District Judge Virginia M. Hernandez Covington seeking authorization to intercept wire and/or electronic communications occurring over

three cellular telephone numbers utilized by Edouard. (Docs. 149-1, 149-4, and 149-7).

The first of these applications was tendered to Judge Covington in late February 2023 and pertained to the cellular telephone bearing the number ending in –9056 (TT-1). (Doc. 149-1). The government asserted in its application that there was probable cause to believe wire and electronic communications concerning certain designated offenses (Target Offenses)[1] would be obtained through the requested wiretap and offered in support of this assertion the sworn affidavit of FBI Special Agent Tyler Rackham. (Docs. 149-1, 149-2).

In his affidavit, Special Agent Rackham began by setting forth his experience with drug-related investigations and his specialized training in narcotics identification, street-level drug trafficking, and drug abatement techniques, among other areas. (Doc. 149-2 at ¶¶ 2–3). Special Agent Rackham then proceeded to chronicle the background of the investigation directed at Edouard and other members of his organization. *Id.* ¶¶ 18–29. Special Agent Rackham explained that the investigation dated back to November 2021, when evidence was uncovered linking Edouard to an individual who died from a fentanyl overdose. *Id.* ¶¶ 21, 22. Special Agent Rackham advised that law enforcement subsequently extracted information from two smart phones belonging to

---

[1] The application defined the Target Offenses as 21 U.S.C. § 841 (possession with the intent to distribute and distribution of controlled substances); 21 U.S.C. § 843(b) (use of a communication facility, to wit, a telephone, to commit, facilitate, or further the commission of drug trafficking offenses); 21 U.S.C. § 846 (conspiracy to commit drug trafficking offenses); 18 U.S.C. §§ 1956 and 1957 (money laundering); and 18 U.S.C. § 924(c)(1)(A) (possession of a firearm during and in relation to, and in furtherance of, a drug trafficking crime). (Doc. 149-1 at ¶ 2).

2

the victim's suspected supplier, which revealed that Edouard used TT-1 between October 2021 and December 2021 to facilitate his narcotics trafficking. *Id.* ¶¶ 21–24. Special Agent Rackham also advised that law enforcement later secured a federal search warrant in March 2022 for Apple iCloud accounts associated with Edouard, which additionally evidenced Edouard's involvement in the drug distribution network, including Edouard's use of Federal Express packages as a means of shipping narcotics. *Id.* ¶ 25–28.

Special Agent Rackham then went on to describe law enforcement's use of a reliable confidential informant (CI)[2] to acquire further evidence against Edouard. *Id.* ¶ 29. Special Agent Rackham explained the CI told law enforcement in December 2022 that Edouard sold large amounts of methamphetamine and fentanyl and that Edouard previously distributed pound quantities of methamphetamine to the CI. *Id.* ¶ 30. Special Agent Rackham reported that following law enforcement's receipt of this information, it supervised the CI's controlled purchase of pound quantities of methamphetamine from Edouard on three separate occasions— December 22, 2022, December 27, 2022, and January 27, 2023. *Id.* ¶¶ 30–49. Special Agent Rackham detailed the specifics of each of these transactions, including that Edouard utilized TT-1 to engage in recorded conversations with the CI during the course of the deals and that the deals themselves were recorded as well. *Id.*

---

[2] Special Agent Rackham stated that the investigators corroborated the information provided by the CI—who agreed to assist law enforcement for monetary gain—through multiple investigative techniques, including physical surveillance, consensually-recorded telephone calls, controlled drug buys, narcotics seizures, and database searches. (Doc. 149-2 at ¶ 29).

Along with this evidence, Special Agent Rackham represented that investigators had additionally developed evidence indicating that Edouard had a narcotics source in Los Angeles, California. *Id.* ¶ 31. According to Special Agent Rackham, this evidence consisted of, among other information, flight records demonstrating that Edouard made "numerous trips" to Los Angeles between at least 2022 and February 2023, the discovery of "bulk cash" in the possession of Edouard and/or his travel associates on at least three occasions when they were stopped by agents, and the listing of TT-1 in documentation affiliated with Edouard's flights. *Id.*

Special Agent Rackham also articulated in his affidavit why it was necessary for law enforcement to employ a wiretap of TT-1 to advance the goals and objectives of its investigation, which included discovering the identities, locations, and roles of Edouard's co-conspirators and collecting sufficient admissible evidence against them. (Doc. 149-2 at ¶¶ 58–107). In doing so, Special Agent Rackham provided a robust recitation of the normal investigative techniques agents had already used or considered in the investigation,[3] as well as details about their successes and failures given the particular circumstances of the investigation. *Id.*

By way of example, Special Agent Rackham noted that investigators had been unable to infiltrate Edouard's organization utilizing an undercover officer, in part,

---

[3] These normal investigative techniques encompassed the use of: (1) undercover officers, (2) confidential sources, (3) cooperating co-conspirators, (4) grand jury subpoenas, (5) search warrants, (6) trash pulls, (7) physical surveillance, (8) geo-location and cell site data, (9) pole cameras, (10) pen registers and trap and trace devices, (11) financial investigations, and (12) mail covers. (Doc. 149-2 at ¶¶ 58–107).

because Edouard was cautious about the individuals with whom he worked due to the fact that his main narcotics distributor had been shot and killed. *Id.* ¶ 66. By way of another example, Special Agent Rackham explained the limitations law enforcement had experienced in obtaining and executing search warrants during the course of the investigation and how the proposed wiretap of TT-1 would enhance the utility of any future search warrants. *Id.* ¶¶ 70–74. As he stated:

> In order to achieve maximum effectiveness, a search warrant must be coordinated with information concerning the immediate whereabouts of the sought-after evidence. Intercepted communications can inform investigators of the immediate presence of drugs, weapons, or other contraband in a timely manner. A search warrant then could follow. The use of these two techniques in conjunction with one another is the most effective way to seize contraband, secure evidence, and ultimately provide evidence against drug trafficking members, which will disrupt or dismantle their [organization.]

*Id.* ¶ 74.

Based upon the government's application and Special Agent Rackham's affidavit, Judge Covington issued an Order on February 27, 2023, authorizing the interception of wire and electronic communications over TT-1 for a period of thirty days. (Doc. 149-3). The government initiated the interception of TT-1 the next day. (Doc. 149-5 at ¶ 20).[4]

The government's second application was presented to Judge Covington in late March 2023 and pertained to TT-1, as well as a second cellular telephone bearing the

---

[4] Prior to the commencement of the wiretap on TT-1, the phone number assigned to that device changed to a phone number ending in –2643. (Doc. 149-5 at ¶ 6 n.1)

number ending in –5217 (TT-2). (Doc. 149-4). Similar to its first application, the government asserted in its second application that there was probable cause to believe Edouard was using both TT-1 and TT-2 to facilitate the commission of the Target Offenses[5] and attached another sworn affidavit authored by Special Agent Rackham to bolster this claim. (Docs. 149-4, 149-5).

In his second affidavit, Special Agent Rackham incorporated his prior sworn statement and additionally detailed certain of Edouard's communications concerning narcotics trafficking that the government collected during the first thirty days of intercepting TT-1. (Doc. 149-5 at ¶¶ 22–39). These communications involved discussions between Edouard and others that related to the quality and selling of illegal drugs, customers who owed Edouard money, and Edouard's efforts to replenish his supply. *Id.* ¶¶ 26–39. Special Agent Rackham further advised that eight of the ten most frequent callers on TT-1 also communicated with Edouard over TT-2 and that the callers common to both of these phones included Edouard's known associates. *Id.* ¶¶ 28, 31, 34, 40, 42, 43, 52, 53. Special Agent Rackham attested as well that TT-2 was affiliated with the same Apple ID as TT-1. *Id.* ¶ 23. And finally, akin to his first affidavit, Special Agent Rackham discussed at length why the interception of wire and electronic communications over TT-1 and wire communications over TT-2 was necessary, including the drawbacks of the standard investigative techniques that the investigators had deployed or contemplated as part of the investigation. *Id.* ¶¶ 54–106.

---

[5] The second application enlarged the Target Offenses to include 18 U.S.C. § 922(g) (felon-in-possession of a firearm). (Doc. 149-4 at ¶ 2).

6

Based upon the government's second application and Special Agent Rackham's second affidavit, Judge Covington issued an Order on March 27, 2023, authorizing the continued interception of wire and electronic communications over TT-1, as well as the interception of wire communications to and from TT-2. (Doc. 149-6). The wiretap of TT-2 was activated the same day. (Doc. 149-8 at ¶ 21).

The government's third application was submitted to Judge Covington in mid-April 2023 and pertained to TT-2, as well as a third cellular telephone bearing the number ending in –8526 (TT-3). (Doc. 149-7). Like the first two applications, the government asserted in its third application that there was probable cause to believe Edouard was utilizing both TT-2 and TT-3 in connection with the Target Offenses and attached as support for this claim a third sworn affidavit compiled by Special Agent Rackham. (Docs. 149-7, 149-8).

In his third affidavit, Special Agent Rackham discussed further communications overheard by law enforcement on TT-1 and TT-2 that involved Edouard and others and that concerned narcotics trafficking. (Doc. 149-8 at ¶¶ 28–49). Special Agent Rackham additionally recounted a March 2023 call, during which Edouard requested that another individual secure new phones for him shortly before he began using TT-3. *Id.* ¶¶ 47–49. Special Agent Rackham also explained that an analysis of calls and texts on TT-3 showed a significant overlap with Edouard's top contacts on TT-1. *Id.* And as before, Special Agent Rackham thoroughly addressed the necessity of the sought-after wiretaps of TT-2 and TT-3. *Id.* ¶¶ 57–118.

7

Based upon the government's third application and Special Agent Rackham's third affidavit, Judge Covington issued an Order on April 12, 2023, authorizing the interception of electronic communications over TT-2, as well as the interception of wire and electronic communications to and from TT-3. (Doc. 149-9). It appears from a review of the file that the wiretap of TT-2 was initiated the same day.

Not long after, in late April 2023, Edouard was arrested in Las Vegas, Nevada on a criminal complaint charging him with conspiracy to possess with the intent to distribute fentanyl and methamphetamine, and possession with the intent to distribute fentanyl and methamphetamine. (Doc. 3). During the ensuing months, a grand jury sitting in this District returned an indictment and later a superseding indictment ultimately charging Edouard with the additional offenses of being a felon-in-possession of a firearm and refusing to provide a Court-ordered DNA sample. (Docs. 14, 117).

## II.

By way of the instant motion, Edouard now asks that the Court "suppress and unseal" the applications and orders authorizing the interception of wire and/or electronic communications over TT-1, TT-2, and TT-3. (Doc. 104). After careful review, I find that Edouard's motion is unsupported.

I begin with Edouard's unsealing request, as it can be readily disposed of. In June 2023, Judge Covington issued an Order directing that the wiretap applications and Orders be unsealed with respect to Edouard, his co-Defendants, and their respective attorneys, with the caveat that the identities of the targets of the

investigation who had not been charged or who were part of an ongoing investigation, among others, remain sealed. (Doc. 72-1). The government represents that since then, it has provided Edouard with copies of all the wiretap applications and Orders. (Doc. 151 at 9). In his motion, Edouard does not explain what further information he seeks by way of his unsealing request or why the items he has received from the government are deficient. As a result, I respectfully submit that this component of Edouard's motion should be denied.

The portion of Edouard's motion asking that the wiretaps be suppressed necessitates a more extended discussion. Before addressing the merits of this request, a review of the law governing wiretaps is instructive.

An application for an order authorizing or approving the interception of wire, oral, or electronic communications must comply with the dictates of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III or the Act). *See* 18 U.S.C. §§ 2510–2520. Title III prescribes that a wiretap application must set forth "a full and complete statement of the facts and circumstances relied upon by the applicant[ ] to justify his belief that an order should be issued," including "details as to the particular offense that has been, is being, or is about to be committed," and the "identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1). The wiretap application must also provide, *inter alia*, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.*

In addition to these requirements, the Act restricts the Executive Branch officials who may ask for a wiretap to, among others, the Attorney General, a Deputy Attorney General, an Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General. 18 U.S.C. § 2516(1). The Act further directs that any communications intercepted in violation of Title III may not be offered as evidence in any trial, hearing, or other proceeding. 18 U.S.C. § 2515.

Upon receipt of a proper application, a court may issue an *ex parte* order authorizing or approving the sought-after interception of wire, oral, or electronic communications. 18 U.S.C. § 2518(3). To do so, a court must find that communications concerning certain enumerated offenses will be acquired through the requested interception and that probable cause exists "that an individual is committing, has committed, or is about to commit" such an offense. 18 U.S.C. § 2518(3)(a), (b). A court must also determine, *inter alia*, that "normal investigative procedures" have either been "tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).[6] The order itself must set forth, among other things, (i) the identity of the person, if known, whose

---

[6] The purpose of this necessity requirement is to ensure that electronic surveillance is not "routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974); *see also United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974) (noting that a showing of necessity guarantees that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime").

communications are to be intercepted; (ii) a particular description of the type of communication sought to be intercepted and a statement of the particular offense to which it relates; and (iii) the period of time during which such interception is authorized.  18 U.S.C. § 2518(4).

The probable cause necessary to support a Title III application is measured at the time the wiretap is issued and is the same as that required for a search warrant. *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985); *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990).  Probable cause for a wiretap does not demand "overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'"  *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (quoting *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990)).  In rendering its probable cause determination, a court must evaluate the "'totality of the circumstances'" through "a 'practical, common-sense'" lens.  *Nixon*, 918 F.2d at 900 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

To prevail on a motion to suppress a wiretap—whether based on a lack of probable cause or another alleged deficiency—a defendant must raise an argument that is "in every critical respect . . . sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) (quoting *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985)).  A defendant's failure to meet this standard subjects his wiretap challenge to denial on that basis alone.  *Cooper*, 203 F.3d at 1284 (observing that a court "need not act upon general or conclusory assertions")

(quoting *Richardson*, 764 F.2d at 1527); *United States v. Rey*, 2008 WL 11383986, at *1 (N.D. Ga. May 15, 2008) ("The motions [to suppress evidence obtained through wiretaps] are scant, unsupported by facts and devoid of any credible arguments. On this basis alone, the motions should be denied."). Similarly, while a court has discretion to conduct an evidentiary hearing on a motion to suppress, *Richardson*, 764 F.2d at 1527, it is not obligated to do so if a defendant does not allege the necessary facts in his motion, *Cooper*, 203 F.3d at 1285 ("[W]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion.") (quoting *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984) (per curiam)); *United States v. Perez*, 661 F.3d 568, 581 n.18 (11th Cir. 2011) (per curiam) (rejecting the assertion that the district court erred in denying a motion to suppress without an evidentiary hearing).

On appeal, a reviewing court will accord "great deference" to an issuing court's probable cause assessment and will "uphold[ ] the [court's] findings even in marginal or doubtful cases." *Nixon*, 918 F.2d at 900 (quoting *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982)); *see also United States v. Moody*, 762 F. Supp. 1491, 1495 (N.D. Ga. 1991) ("In passing upon the validity of the authorization, the court accords 'great deference' to the issuing judge's probable cause determination.") (citation omitted). A defendant bears the burden of overcoming this presumption. *United States v. Green*,

12

2023 WL 4374398, at *4 (M.D. Ga. July 6, 2023) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)).[7]

With these principles in mind, I turn to the claims upon which Edouard grounds his motion to suppress. Although not entirely clear, these claims appear to be as follows: (1) "[t]he [a]ffidavit in support of the [w]arrant [a]pplication failed to establish probable cause that a crime was committed;" (2) the Title III Order authorizing or approving interception was "insufficient on it[s] face;" (3) the government's "application failed to provide the magistrate [sic] who issued the warrant with evidence to establish a nexus between the items and phones to be intercepted;" (4) an unspecified interception was "not made in [conformity] with the Order of authorization or approval" and was "in violation of the statutory scheme;" and (5) Congress did not intend that the power to authorize a wiretap be made by anyone other than the Attorney General or the Assistant Attorney General. (Doc. 104).[8]

The threshold problem with these claims is that Edouard does not set forth any facts or legal argument to support them. *Id.* In fact, it is not even evident from his vague references to an "application," "affidavit," and "Order" which of the three applications, affidavits, or Orders he is attacking, much less the particular bases upon which he predicates his motion. *Id.* And although Edouard includes a handful of citations to cases and statutes, including some from outside this Circuit, he does not

---

[7] The Eleventh Circuit, in its *en banc* decision in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), adopted as precedent the opinions of the former Fifth Circuit issued prior to October 1, 1981.
[8] I have reordered Edouard's claims for purposes of my analysis.

13

articulate how those legal authorities buttress his request for relief. *See, e.g.*, (Doc. 104 at 3) (citing *United States v. Pickard*, 733 F.3d 1297 (10th Cir. 2013); *People v. Pina*, 2021 WL 1134825 (Cal. Dist. Ct. App. 2021); CAL. PENAL CODE § 629.72 (West 2023)). The perfunctory nature of Edouard's claims constitutes a waiver on the matter and is fatal to his suppression request. *See Cooper*, 203 F.3d at 1284; *Rey*, 2008 WL 11383986, at *1 (denying a motion to suppress a wiretap where the defendant "did not allege facts with sufficient particularity to support his request for suppression of evidence"); *Richardson*, 764 F.2d at 1527 ("Once a defendant has failed to make a proper pretrial request for suppression, the opportunity is waived unless the district court grants relief for good cause shown."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."), *overruled on other grounds in part by United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015); *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1286 n.3 (11th Cir. 2003) (finding an issue to be abandoned where no argument was made). For the same reason, I find that a hearing on Edouard's suppression request to be unnecessary. *Cooper*, 203 F.3d at 1285 ("Defendants are not entitled to an evidentiary hearing based on a 'promise' to prove at the hearing that which they did not specifically allege in their motion to suppress.").

Notwithstanding these deficiencies, I will address the merits of Edouard's contentions to the extent possible. Out of abundance of caution, however, I will assume for the sake of argument that Edouard seeks to contest all three of the Court's

14

Title III Orders, along with the underlying applications and affidavits upon which they rest.

Edouard's first claim—as noted above—is that the government's wiretap applications are not supported by probable cause. (Doc. 104 at 3). This claim is devoid of merit.

As discussed earlier, in his first affidavit, Special Agent Rackham recounted a series of communications between Edouard and others involving TT-1 that related to narcotics trafficking. (Doc. 149-2). These communications included recorded conversations concerning the three controlled purchases of methamphetamine by the CI, during which Edouard used TT-1 to facilitate the sale. (Doc. 149-2).

As also discussed above, to extend the monitoring of TT-1 and to initiate the interception of wire communications on TT-2, Special Agent Rackham described in his second affidavit intercepted communications pertaining to the sale of controlled substances between Edouard and others, as well as Edouard's utilization of both TT-1 and TT-2 for this purpose. (Doc. 149-5). And to begin the interception of electronic communications on TT-2 and to commence the interception of communications over TT-3, Special Agent Rackham detailed in his third affidavit discussions between Edouard and others regarding narcotics that involved each of these two cellular telephones. (Doc. 149-8). In sum, there is ample evidence to sustain Judge Covington's findings that probable cause existed to believe Edouard had been and

would persist in engaging in criminal activity using TT-1, TT-2, and TT-3. As noted previously, Edouard does not meaningfully argue otherwise.[9]

Edouard's next contention that the Title III Orders were facially insufficient also fails. (Doc. 104 at 2). In approving the government's wiretap applications, Judge Covington specified, *inter alia*, the identity of the person whose communications were to be intercepted; the type of communication sought to be intercepted and the particular offenses to which they related; the agency authorized to intercept the communications and the person authorizing the application; and the period of time during which interception was permitted. *See* 18 U.S.C. § 2518(4); (Docs. 149-3, 149-6, and 149-9). The Title III Orders additionally set forth the basis for Judge Covington's probable cause determination and her conclusion that "normal investigative procedures" had either been "tried and ha[d] failed or reasonably appear[ed] to be unlikely to succeed if tried or [would] be too dangerous." *See* 18 U.S.C. § 2518(3)(c); (Docs. 149-3, 149-6, and 149-9). Edouard does not identify, nor can I ascertain, any portion of Judge Covington's wiretap Orders that are facially infirm.

Edouard's claim that the government's wiretap applications do not "establish a nexus between the items and phones to be intercepted" is lacking as well. (Doc. 104 at 2). Putting aside the opaque nature of this challenge, it appears from Special Agent

---

[9] In light of this determination, I need not address the government's argument made in passing that the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984) would preclude exclusion of the wiretap evidence even if the Court were to conclude that probable cause was absent. (Doc. 151 at 8 n.3).

Rackham's affidavits that he adequately demonstrated a connection between Edouard's alleged criminal activities and each of three cellular telephones that are the subject of the Court's Title III Orders. (Docs. 149-3, 149-6, 149-9). Special Agent Rackham sets forth sufficient facts in his sworn statements, for example, that evidence Edouard utilized TT-1, TT-2, and TT-3 to facilitate his drug activities. *Id.* These facts included intelligence gleaned from the CI, intercepted conversations involving Edouard and others concerning their drug trade, pen register and toll analysis of the three phones, and search warrant results. *Id.* As with Edouard's challenge to the facial sufficiency of the Title III Orders, he does not delineate, nor can I discern, a proper basis for this claim.

Edouard's assertion that "[t]he interception was not made in [conformity] with the Order of authorization or approval" and was "in violation of 'the statutory scheme'" is likewise wanting. (Doc. 104 at 2). Indeed, this claim is so conclusory as to render it difficult, if not impossible, to analyze in any meaningful way. For instance, as the government points out in its brief (Doc. 151 at 6), Edouard does not explain whether some or all of the interceptions contravened Judge Covington's three Orders, nor does he identify which interceptions were wrongly made and on what basis. He also does not describe how the interceptions violated the "statutory scheme."

I am similarly unpersuaded by Edouard's last claim that Congress did not intend the power to submit wiretap applications to be exercised by individuals other than the Attorney General or Assistant Attorney General designated by him. (Doc. 104 at 3). The gist of this challenge seems to be that the applications in this case were presented

17

to Judge Covington by Executive Branch officials who were not sanctioned under Title III to approve those submissions. *Id.*

As set forth previously, however, section 2516 of Title 18 allows "any Deputy Assistant Attorney General . . . in the Criminal Division . . . specially designated by the Attorney General . . ." to authorize a wiretap application. 18 U.S.C. § 2516(1). To this end, by way of an Order dated March 12, 2021, the then (and current) Attorney General—Merrick Garland—explicitly delegated the power to approve Title III applications to any Deputy Assistant Attorney General in charge of the Criminal Division. (Doc. 149-1 at 19). And in accordance with this decree, a Deputy Assistant Attorney General for the Criminal Division signed off on each of the wiretap applications here. *See* (Doc. 149-1 at 16, 18; Doc. 149-4 at 16, 18; Doc. 149-7 at 18, 20). Further, the government attached these authorizations to its wiretap applications, along with Attorney General Garland's March 2021 Order. *Id*. As a result, Edouard's contention that these approvals did not comport with Congressional intent cannot stand.

## III.

Based upon the foregoing, I respectfully recommend that Edouard's motion seeking the unsealing of the wiretap applications and Orders, as well as the suppression of the wiretaps (Doc. 104) be denied.

Respectfully submitted this 27th day of October 2023.

*[signature]*
HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## **NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable Kathryn Kimball Mizelle, United States District Judge
Counsel of record
*Pro se* Defendant Enock Edouard