UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  Case No. 8:23-cr-158-KKM-CPT

ENOCK EDOUARD
_____/

**REPORT AND RECOMMENDATION**

Before me on referral is Defendant Enock Edouard's *Amended Motion to Suppress with Attached Motion to Dismiss* (Doc. 176)[1] and the government's response in opposition (Doc. 194). For the reasons discussed below, I respectfully recommend that Edouard's motion be denied in its entirety.

I.

The facts of this matter are set forth in a prior Order of the Court (Docs. 184, 217) but bear repeating here with some supplementation. This case stems from an investigation conducted by several law enforcement agencies, including the Federal Bureau of Investigation (FBI), that targeted a drug trafficking organization centered around Edouard and various other individuals. (Doc. 149-2 at ¶ 4). As part of this

---

[1] Although Edouard denominates his motion as "amended," his submission appears to seek relief based upon reasons that are sufficiently distinct from those set forth in any of his earlier filings. Regardless of whether Edouard's motion truly constitutes an amended filing, my conclusions are the same.

investigation, the government submitted three applications to United States District Judge Virginia M. Hernandez Covington seeking authorization to intercept wire and/or electronic communications occurring over three cellular telephone numbers utilized by Edouard. (Docs. 149-1, 149-4, and 149-7).

The first of these applications was presented to Judge Covington in late February 2023 and pertained to the cellular telephone bearing the number ending in –9056 (TT-1). (Doc. 149-1). The government asserted in its application that there was probable cause to believe wire and electronic communications concerning certain designated offenses (Target Offenses)[2] would be obtained through the requested wiretap and offered in support of this assertion the sworn affidavit of FBI Special Agent Tyler Rackham. (Docs. 149-1, 149-2).

In his affidavit, Special Agent Rackham began by setting forth his experience with drug-related investigations and his specialized training in narcotics identification, street-level drug trafficking, and drug abatement techniques, among other areas. (Doc. 149-2 at ¶¶ 2–3). Special Agent Rackham then proceeded to chronicle the background of the investigation directed at Edouard and other members of his organization. *Id.* ¶¶ 18–29. Special Agent Rackham explained that the investigation dated back to November 2021, when evidence was uncovered linking Edouard to an individual

---

[2] The application defined the Target Offenses as 21 U.S.C. § 841 (possession with the intent to distribute and distribution of controlled substances); 21 U.S.C. § 843(b) (use of a communication facility, to wit, a telephone, to commit, facilitate, or further the commission of drug trafficking offenses); 21 U.S.C. § 846 (conspiracy to commit drug trafficking offenses); 18 U.S.C. §§ 1956 and 1957 (money laundering); and 18 U.S.C. § 924(c)(1)(A) (possession of a firearm during and in relation to, and in furtherance of, a drug trafficking crime). (Doc. 149-1 at ¶ 2).

identified as "D.B.," who died from a fentanyl overdose. *Id.* ¶¶ 21, 22. Special Agent Rackham advised that law enforcement subsequently extracted information from two smart phones belonging to the victim's suspected supplier, which revealed that Edouard used TT-1 between October 2021 and December 2021 to facilitate his narcotics trafficking. *Id.* ¶¶ 21–24. Special Agent Rackham also advised that law enforcement later secured a warrant in March 2022 for Apple iCloud accounts associated with Edouard, which additionally evidenced Edouard's involvement in the drug distribution network, including Edouard's use of Federal Express packages as a means of shipping narcotics. *Id.* ¶ 25–28.

Special Agent Rackham then went on to describe law enforcement's use of a reliable confidential informant (CI)[3] to acquire further evidence against Edouard. *Id.* ¶ 29. Special Agent Rackham explained the CI told law enforcement in December 2022 that Edouard sold large amounts of methamphetamine and fentanyl and that Edouard previously distributed roughly pound quantities of methamphetamine to the CI as well. *Id.* ¶ 30. Special Agent Rackham reported that following law enforcement's receipt of this information, it supervised the CI's controlled purchase of pound quantities of methamphetamine from Edouard on three separate occasions— December 22, 2022, December 27, 2022, and January 27, 2023. *Id.* ¶¶ 30–49. Special Agent Rackham detailed the specifics of each of these transactions, including that

---

[3] Special Agent Rackham stated that the investigators corroborated the information provided by the CI—who agreed to assist law enforcement for monetary gain—through multiple investigative techniques, including physical surveillance, consensually-recorded telephone calls, controlled drug buys, narcotics seizures, and database searches. (Doc. 149-2 at ¶ 29).

3

Edouard utilized TT-1 to engage in recorded conversations with the CI during the course of the deals and that the deals themselves were also recorded. *Id.*

Along with this proof, Special Agent Rackham represented that investigators had additionally developed evidence indicating that Edouard had a narcotics source in Los Angeles, California. *Id.* ¶ 31. According to Special Agent Rackham, this evidence consisted of, among other information, flight records demonstrating that Edouard made "numerous trips" to Los Angeles between at least 2022 and February 2023, the discovery of "bulk cash" in the possession of Edouard and/or his travel associates on at least three occasions when they were stopped by agents, and the listing of TT-1 in documentation affiliated with Edouard's flights. *Id.*

Special Agent Rackham further articulated in his affidavit why it was necessary for law enforcement to intercept TT-1 to advance the goals and objectives of the investigation, which included discovering the identities, locations, and roles of Edouard's co-conspirators and collecting sufficient admissible evidence against them. (Doc. 149-2 at ¶¶ 58–107). In doing so, Special Agent Rackham provided a robust recitation of the normal investigative techniques agents had already employed or considered in the investigation,[4] as well as details about their successes and failures given the particular circumstances they encountered. *Id.*

---

[4] These normal investigative techniques encompassed the use of: (1) undercover officers, (2) confidential sources, (3) cooperating co-conspirators, (4) grand jury subpoenas, (5) search warrants, (6) trash pulls, (7) physical surveillance, (8) geo-location and cell site data, (9) pole cameras, (10) pen registers and trap and trace devices, (11) financial investigations, and (12) mail covers. (Doc. 149-2 at ¶¶ 58–107).

By way of example, Special Agent Rackham noted that investigators had been unable to infiltrate Edouard's organization utilizing an undercover officer, in part, because Edouard was cautious about the individuals with whom he worked due to the fact that his main narcotics distributor had been shot and killed. *Id.* ¶ 66. By way of another example, Special Agent Rackham explained the limitations law enforcement had experienced in obtaining and executing warrants during the course of the investigation and how the proposed wiretap of TT-1 would enhance the utility of any future warrants. *Id.* ¶¶ 70–74. As he stated:

> In order to achieve maximum effectiveness, a search warrant must be coordinated with information concerning the immediate whereabouts of the sought-after evidence. Intercepted communications can inform investigators of the immediate presence of drugs, weapons, or other contraband in a timely manner. A search warrant then could follow. The use of these two techniques in conjunction with one another is the most effective way to seize contraband, secure evidence, and ultimately provide evidence against drug trafficking members, which will disrupt or dismantle their [organization.]

*Id.* ¶ 74.

Based upon the government's application and Special Agent Rackham's affidavit, Judge Covington issued an Order on February 27, 2023, authorizing the interception of wire and electronic communications over TT-1 for a period of thirty days. (Doc. 149-3). The government initiated the interception of TT-1 the next day. (Doc. 149-5 at ¶ 20).[5]

---

[5] Prior to the commencement of the wiretap on TT-1, the phone number assigned to that device changed to a phone number ending in –2643. (Doc. 149-5 at ¶ 6 n.1)

The government's second application was tendered to Judge Covington in late March 2023 and pertained to TT-1, as well as to a second cellular telephone bearing the number ending in –5217 (TT-2). (Doc. 149-4). Similar to its first application, the government asserted in its second application that there was probable cause to believe Edouard was using both TT-1 and TT-2 to facilitate the commission of the Target Offenses[6] and attached another sworn affidavit authored by Special Agent Rackham to bolster this claim. (Docs. 149-4, 149-5).

In his second affidavit, Special Agent Rackham incorporated his prior sworn statement and additionally described certain of Edouard's communications concerning narcotics trafficking that the government collected during the first thirty days of intercepting TT-1. (Doc. 149-5 at ¶¶ 22–39). These communications involved discussions between Edouard and others that related to the quality and sale of illegal drugs, customers who owed Edouard money, and Edouard's efforts to replenish his supply. *Id.* ¶¶ 26–39. Special Agent Rackham further advised that eight of the ten most frequent callers on TT-1 also communicated with Edouard over TT-2 and that the callers common to both of these phones included Edouard's known associates. *Id.* ¶¶ 28, 31, 34, 40, 42, 43, 52, 53. Special Agent Rackham attested as well that TT-2 was affiliated with the same Apple ID as TT-1. *Id.* ¶ 23. And finally, akin to his first affidavit, Special Agent Rackham discussed at length why the interception of wire and electronic communications over TT-1 and wire communications over TT-2 was

---

[6] The second application enlarged the Target Offenses to include 18 U.S.C. § 922(g) (felon-in-possession of a firearm). (Doc. 149-4 at ¶ 2).

necessary, including the drawbacks of the standard investigative techniques that the investigators had deployed or contemplated as part of the investigation. *Id.* ¶¶ 54–106.

After reviewing the government's second application and Special Agent Rackham's second affidavit, Judge Covington issued an Order on March 27, 2023, authorizing the continued interception of wire and electronic communications over TT-1, as well as the interception of wire communications to and from TT-2. (Doc. 149-6). The wiretap of TT-2 was activated the same day. (Doc. 149-8 at ¶ 21).

The government's third application was submitted to Judge Covington in mid-April 2023 and pertained to TT-2, as well as to a third cellular telephone bearing the number ending in –8526 (TT-3). (Doc. 149-7). Like the first two applications, the government asserted in its third application that there was probable cause to believe Edouard employed both TT-2 and TT-3 in connection with the Target Offenses and attached as support for this claim a third affidavit sworn to by Special Agent Rackham. (Docs. 149-7, 149-8).

In his third affidavit, Special Agent Rackham discussed additional narcotics-related communications overheard by law enforcement on TT-1 and TT-2 that involved Edouard and others. (Doc. 149-8 at ¶¶ 28–49). Special Agent Rackham also recounted a March 2023 call, during which Edouard requested that another individual secure new phones for him shortly before he began using TT-3. *Id.* ¶¶ 47–49. Special Agent Rackham further explained that an analysis of the calls and texts on TT-3 revealed a significant overlap with Edouard's top contacts on TT-1. *Id.* And, as

before, Special Agent Rackham thoroughly addressed the necessity of the sought-after wiretaps of TT-2 and TT-3. *Id.* ¶¶ 57–118.

Upon consideration of the government's third application and Special Agent Rackham's third affidavit, Judge Covington issued an Order on April 12, 2023, authorizing the interception of electronic communications over TT-2, as well as the interception of wire and electronic communications to and from TT-3. (Doc. 149-9). It appears from a review of the file that the wiretap of TT-2 was initiated the same day.

Not long after, in late April 2023, Edouard was arrested in Las Vegas, Nevada on a criminal complaint filed in this District charging him with possession with the intent to distribute fentanyl and methamphetamine, and conspiracy to commit same. (Doc. 3). A grand jury sitting in this District later indicted Edouard with the additional offenses of being a felon-in-possession of a firearm and refusing to provide a Court-ordered DNA sample. (Docs. 14, 117).[7]

In August 2023, Edouard moved to "suppress and unseal" the applications and Orders authorizing the interception of wire and/or electronic communications over TT-1, TT-2, and TT-3. (Doc. 104). In a subsequently filed report and recommendation (R&R), I recommended that Edouard's motion be denied. (Doc. 184). The Court agreed and adopted the R&R in early December 2023. (Doc. 217).

---

[7] To date, the grand jury has returned an indictment and two superseding indictments against Edouard and others. (Docs. 14, 117, 186). The last of these indictments was filed after Edouard submitted the instant motion. (Doc. 186). I will assume for purposes of my analysis that Edouard's motion is directed at this most recent indictment.

8

By way of the instant motion, Edouard now asks that the Court "suppress and dismiss" the pending charges against him. (Doc. 176). In support of this relief, Edouard appears to assert that law enforcement first identified the CI during a December 2022 investigation into the murder of an individual named Earl Williams.[8] *Id.* Edouard further avers that a Hillsborough County Sheriff's Office detective obtained permission from Williams's mother to search Williams's phone but then "deviated" from the homicide investigation and "conspired" with Special Agent Rackham to entrap Edouard by contacting the CI, who—as explained above—engaged in three controlled buys from Edouard. *Id.* Based upon these allegations, Edouard claims that law enforcement violated the Fourth Amendment as well as his due process and equal protection rights by: (1) improperly searching Williams's cell phone without probable cause and without a warrant; (2) failing to "establish a nexus" between the Williams homicide investigation, the CI, Edouard, and the FBI's drug trafficking investigation; (3) "objectively" entrapping Edouard; and (4) discriminating against him by "administer[ing] an evil eye and an equal hand."[9] *Id.* Each of these claims will be addressed in turn below, beginning with Edouard's challenge to the police's search of Williams's cell phone.

---

[8] I assume that Williams is not the same homicide victim identified in the wiretap applications as "D.B." (Doc. 149-2 at ¶ 21).

[9] I have reordered and consolidated Edouard's claims to facilitate my disposition of same. I also assume for the sake of argument that Edouard's factual assertions are true, including his suggestion that the CI's participation in the investigation stemmed from law enforcement's search of Williams's cell phone.

II.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A search or seizure will generally be deemed to be reasonable under the Fourth Amendment if it is conducted pursuant to a warrant issued on probable cause.  *Howell v. Bradshaw*, 2009 WL 10710388, at *11 (S.D. Fla. Feb. 17, 2009) ("The Fourth Amendment's requirement that searches and seizures be reasonable typically requires a warrant issue[d] upon probable cause.") (citing *Skinner v. Ry. Labor Exes.' Assoc.*, 489 U.S. 602, 619 (1989); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 667 (1989)), *aff'd*, 349 F. App'x 399 (11th Cir. 2009) (per curiam).[10]

The Fourth Amendment's protections, however, extend only to items or places in which a person has a "constitutionally protected reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  The question of "whether an individual has a reasonable expectation of privacy in the object of [a] challenged search[ ] has come to be known colloquially . . . as Fourth Amendment 'standing.'" *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc).

To establish Fourth Amendment standing, a person must have "both a subjective and an objective expectation of privacy" in the item or place searched. *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (internal quotation marks

---

[10] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

10

and citation omitted). "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *Id.* A movant challenging a search bears the burden of satisfying both of these elements. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.") (citations omitted); *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) ("The individual challenging [a] search bears the burdens of proof and persuasion.") (citation omitted). These requirements apply equally to the search of a cell phone. *United States v. Gregg*, 771 F. App'x 983, 986–87 (11th Cir. 2019) ("To have standing to challenge the search of a cell phone, a defendant bears the burden of establishing both a subjective and an objective expectation of privacy in its contents.") (internal quotation marks omitted).

  The fact that an individual has standing to contest a search does not end the inquiry, however. This is because "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1991)); *see also Heien v. North Carolina*, 574 U.S. 54, 60 (2014) ("[W]e have repeatedly affirmed[ that] 'the ultimate touchstone of the Fourth Amendment is reasonableness.'") (quoting *Riley v. California*, 573 U.S. 373, 381 (2014)) (internal quotation marks omitted)). In this regard, the Supreme Court has "long approved consensual searches" on the ground that it is "no doubt reasonable" for the police to

undertake such actions. *Jimeno*, 500 U.S. at 250–51. And since consent searches are reasonable under the Fourth Amendment, courts have found them to be exempt from the Fourth Amendment's probable cause and warrant requirements. *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) ("A search conducted pursuant to consent is a recognized exception to the requirements of probable cause and a search warrant.") (citing *United States v. Baldwin*, 644 F.2d 381, 383 (5th Cir. 1981)).[11]

Edouard does not show that he has standing to contest law enforcement's search of Williams's cell phone here. *King*, 509 F.3d at 1341. "To establish a reasonable expectation of privacy sufficient to challenge the search of a cell phone[,] courts have routinely required a defendant to offer evidence demonstrating that he owned, possessed, or used the phone." *United States v. Boyce*, 2021 WL 9217153, at *6 (N.D. Ga. Nov. 10, 2021) (collecting cases), *report and recommendation adopted*, 2022 WL 2438410 (N.D. Ga. July 5, 2022). Edouard makes no such showing in his motion, and this deficiency alone is fatal to his Fourth Amendment claim. *See United States v. Harris*, 2016 WL 11469673, at *5 (M.D. Fla. July 25, 2016) (denying a motion to suppress evidence obtained from cell phones where the defendants "asserted no claim to or interest in the cell phones at issue[, t]he cell phones were not registered in [d]efendants' names, and [d]efendants presented no evidence regarding their possession, use, or control of the phones"), *report and recommendation adopted sub nom. United States v. Villanueva*, 2016 WL 4150002 (M.D. Fla. Aug. 3, 2016).

---

[11] The Eleventh Circuit, in its *en banc* decision in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), adopted as precedent the opinions of the former Fifth Circuit rendered prior to October 1, 1981.

Even if Edouard has standing to challenge the search of Williams's cell phone, his challenge fails in any event. This is because Edouard admits that Williams's mother consented to the search of the device (Doc. 176 at 1), which means that law enforcement did not need probable cause or a warrant to examine it. *Harris*, 928 F.2d at 1117.

As noted above, Edouard next asserts that the government did not establish a "nexus" between the Williams homicide investigation, the CI, Edouard, and the FBI's drug trafficking investigation. (Doc. 176 at 3). Edouard raised a similar argument in his first motion to suppress, which the Court deemed to be unfounded. (Doc. 184 at 16–17; Doc. 217). As explained in the R&R adopted by the Court, Special Agent Rackham's affidavits demonstrated a sufficient connection between Edouard's alleged criminal activities and each of the three cellular telephones that were the subject of the Court's wiretap's Orders. *Id*. Edouard does not submit any authority in his instant motion which undermines this conclusion or which otherwise shows that law enforcement could not use information obtained from a consensual search of Williams's phone, such as the CI's name.[12]

Edouard additionally avers—as referenced earlier—that he was subject to "objective entrapment." (Doc. 176 at 1). This contention is flawed in several respects. To start, Edouard raises the claim only in passing and does not make any attempt to

---

[12] As the government contends, Edouard implies but does not expressly state that law enforcement identified the CI through Williams's cell phone. (Doc. 194 at 3). Given the infirmities with Edouard's motion, the Court need not determine whether this is actually the case.

substantiate it. As a result, he has waived any such contention. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."), *overruled on other grounds in part by United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015); *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1286 n.3 (11th Cir. 2003) (finding an issue to be abandoned where no argument was made).

Irrespective of whether Edouard has waived this claim, it is without merit in any event. Florida law provides two theories of entrapment—objective and subjective. *Jimenez v. State*, 993 So. 2d 553, 555 (Fla. Dist. Ct. App. 2008). Objective entrapment concentrates "on the conduct of law enforcement[ and] operates as a bar to prosecution in those instances where the government's conduct so offends decency or a sense of justice that it amounts to a denial of due process." *Davis v. State*, 937 So. 2d 300, 302 (Fla. Dist. Ct. App. 2006) (quotations omitted). Subjective entrapment, by contrast, "focuses on inducement of the accused based on an apparent lack of predisposition to commit the offense." *Hall v. State*, 326 So. 3d 1188, 1189 (Fla. Dist. Ct. App. 2021) (quoting *Davis*, 937 So. 2d at 302).

The problem with Edouard's reliance on an objective entrapment argument is that "[a]lthough Florida law recognizes a defense of objective entrapment, the Supreme Court has never 'squarely established' a federal constitutional right to dismissal of criminal charges" predicated on this theory. *Luna v. Sec'y, Dep't of Corr.*, 2023 WL 2456510, at *9 (M.D. Fla. Mar. 10, 2023) (citing *Knowles v. Mirzayance*, 556

14

U.S. 111, 122 (2009)); *see also Lewis v. Sec'y, Fla. Dep't of Corr.*, 2020 WL2766171, at *11 (M.D. Fla. May 28, 2020) (observing that there is no "clearly established federal law stating that there is a constitutional right to dismiss a case based on objective entrapment"). And even were such a defense to be cognizable in federal court, there is no reason to believe it would apply here, given that the apparently challenged government conduct simply involved a CI making controlled buys of narcotics from a supplier—i.e., Edouard—from whom the CI claimed to have obtained drugs in the past. Suffice it to say that such behavior by the government hardly "so offends decency or a sense of justice that it amounts to a denial of due process." *Davis*, 937 So. 2d at 302 (internal quotations omitted). Edouard therefore has not demonstrated a right to relief on this basis.

Lastly, Edouard maintains—as mentioned previously—that law enforcement discriminated against him by "administer[ing] an evil eye and an unequal hand." (Doc. 176 at 3). As the government points out, this phrase is taken from the Supreme Court's decision in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), in which the Court held that a law which is race-neutral but which is applied in a prejudicial manner offends the Constitution's Equal Protection Clause. *Id.* at 372–73. As the Court in *Yick Wo* explained:

> [T]hough the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to

their rights, the denial of equal justice is still within the prohibition of the constitution.

*Id.*

Here, Edouard presents no meaningful argument that he was subjected to treatment different from that afforded any other individual investigated or prosecuted for drug trafficking crimes and related offenses. Edouard's perfunctory references in his motion to the Due Process and Equal Protection Clauses (Doc. 176 at 2–4, 6) do not cure this defect. For the reasons discussed above, Edouard's failure to provide any factual basis for this contention constitutes a waiver on the matter. *See United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985); *Hamilton*, 680 F.3d at 1319; *Mendoza*, 327 F.3d at 1286 n.3.

### III.

Based upon the foregoing, I respectfully recommend that Edouard's *Amended Motion to Suppress with Attached Motion to Dismiss* (Doc. 176) be denied.

Respectfully submitted this 21st day of December 2023.

_____
HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable Kathryn Kimball Mizelle, United States District Judge
Counsel of record
*Pro se* Defendant Enock Edouard